336 So.2d 24 (1976)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellant-Appellee,
v.
Dorothy Finke MIMS et al., Defendants-Appellees-Appellants.
No. 5493.
Court of Appeal of Louisiana, Third Circuit.
July 6, 1976.
Dissenting Opinion July 21, 1976.
Rehearing Denied August 18, 1976.
On Rehearing August 19, 1976.
Writs Refused November 5, 1976.
*26 Jack C. Fruge, Ville Platte, Johnie E. Branch, Jr., Wm. W. Irwin, Jr., Marshall W. Wroten, Baton Rouge, for plaintiff-appellant-appellee.
Jack O. Brittain, Natchitoches, for defendants-appellees-appellants.
Before HOOD, MILLER and WATSON, JJ.
MILLER, Judge.
Plaintiff Louisiana Department of Highways appeals seeking a reduction in the $98,190.89 awarded defendants-landowners Dorothy Finke Mims and James Mims in payment for, and damages related to, the Department's expropriation under the "quick taking statute." LSA-R.S. 48:441 et seq. Landowners also appeal seeking an increase in the award together with attorney fees. We amend to make a slight reduction in the award, and affirm.
This is the same litigation which was before us in State, Department of Highways v. Mims, 311 So.2d 914 (La.App. 3 Cir. 1975). It now comes up on the merits.
On March 21, 1972, the Department filed expropriation proceedings to take eleven separate tracts totaling 35.25 acres. The Department deposited $22,982.20 as the fair market value of, and severance damages related to, the taken properties. Landowners were allowed to keep their minerals in perpetuity.
After the first trial the court awarded $56,250.02 for both the fair market value of the taken lands and severance damages suffered by landowners' remaining properties. In written reasons assigned at that time, the court accepted the appraisal by landowners' expert T. J. Stephens as being in accord with actual values. Nevertheless, specific reasons were assigned for reducing many items in Stephens' appraisal. No reasons were assigned after that first hearing to support the refusal to award $19,950 in severance damages which, according to Stephens, resulted from the highway dividing landowners' pastureland into two separate operations.
Although little additional evidence was heard at the remand, the court increased the first award by $41,940.87. The court's written reasons were limited to a brief statement that Stephens' appraisal "accurately and truly sets forth the values of the properties taken and all damages resulting from the taking." On that basis the court awarded $98,190.89.
In order to understand the issues, one must be aware of the 1959 highway right-of-way servitude negotiated and signed by the Department and the Mims. On the basis *27 that the Natchitoches bypass road was to be constructed in the early sixties, the Mims sold to the Department a 35.178 acre right of way and some 24 acres of borrow pits for $10,985.70. In the 1959 written agreements the Department undertook to 1) move a house, 2) move certain ornamentals, 3) drill a waterwell, and 4) provide an underpass so that the Mims 828 acre cattle operation would not be divided by the highway fencing and 15 foot high fill needed for the new road. Except for the underpass, the projected 1959 road would have divided the pastureland into two separate farm operationsone of 478 acres to the east, and the other of 320 acres to the west.
The Department did not use the 1959 servitude before the 1972 taking. The eleven parcels taken in 1972 are alongside the 1959 servitude and were necessary because in 1972 the Department was providing for four lanes instead of the two planned in 1959, and the fill was to have a slope of one in six instead of one in four.
Construction of the road had commenced at the time of the first trial, and was almost completed at the second. The trial court's increase in the award could well have been based on the update of information at the second trial. For instance, at the first trial there was evidence tending to show that although the Department did not provide by contract for the underpass connecting landowners' two pastures, the contractor Intended to provide an underpass. At the second trial the Department offered no evidence to indicate the underpass had been or would be provided. Landowners testified there was no underpass. The failure to provide the underpass alone could account for at least a $19,950 increase in the trial court's first award.

EXPERT APPRAISERS
The trial court's conclusion that T. J. Stephens' appraisal was the best defended is well supported by the evidence. Credibility of the Department's experts was reduced by several factors. Both were almost full time contract appraisers for the Department; both were directed by the Department to use only one method of appraisal, the before and after method, and they did not consider the front land-rear land method; neither of the Department's experts had ever bought or sold property in Natchitoches Parish, and both thought there were only two or three subdivisions between the Mims property and Natchitoches, whereas there were at least ten; and finally, the Department's experts based their opinion in part on misinformation concerning the price paid for an important comparable.
Furthermore the Department failed to present testimony of one of its experts who appraised the Mims property. The Department did not explain why that expert was not called to testify. There is an adverse inference that this expert would have testified against the Department. State, Department of Highways v. Willet, 322 So.2d 383 (La.App. 3 Cir. 1975); Pugh, Louisiana Evidence Law (1974), pp. 716-8.
The trial court was impressed by Stephens' qualifications because he was an independent appraiser; his methods of appraisal have been approved by the jurisprudence; for many years he has bought and sold Natchitoches Parish properties on a daily basis; his comparables were well establishedindeed, one witness testified that before the expropriation (and certainly after), he attempted to buy the Mims rural residential properties appraised by Stephens and was prepared to pay the sums used in Stephens' appraisal. The land was not for sale. It was the rural residential properties that landowners' experts valued at some four times the value set by the Department's appraisers.
*28 There is no manifest error in the trial court's adoption of most of Stephens' appraisal, and his rejection of the Department's appraisals. State, Department of Highways v. Hab Monsur Corp., 301 So.2d 667 at 672 (La.App. 3 Cir. 1974).
We find manifest error in only one phase of the trial court's award. In that instance we accept the trial court's first opinion. The court increased the $6,500 awarded for parcel 1-5 at the first hearing to $13,500 after the second. This parcel of 2.2 acres touches Spanish Lake Road at the intersection of the 1959 servitude. The Department's appraisals averaged $1,284 for the parcel while Stephens assigned a value of $13,500. According to Stephens the property was rural commercial property with a value of $30 per front foot. In written reasons assigned after the first trial, the court held Stephens' evaluation "somewhat too high because rather extensive work would have to be done filling the land to make it properly useable commercially and because of very limited commercial development in this area of Natchitoches Parish." The refusal to award more than $6,500 was well supported by that reasoning. The only commercial development in the area was the road contractor's rental of a nearby parcel as a work area. If anything was established in this trial it is that fill work is costly. Therefore, we reduce the $13,500 awarded at the second trial to the original award of $6,500.
There is no manifest error in the trial court's acceptance of the remainder of Stephens' appraisal. The Department contends landowners' appraisals were based on values attributed to the fronting of some of the Mims properties on the 1959 servitude, arguing this is improper since no highway was built until after the 1972 taking. We follow the cases of State, Department of Highways v. Wax, 295 So.2d 833 (La.App. 1 Cir. 1974), and State, Department of Highways v. Beatty, 288 So.2d 900 (La.App. 1 Cir. 1974). The court there ruled that where expropriated property was not included within the scope of the project from the beginning, and the project was subsequently enlarged to include additional property, landowner is entitled to receive compensation for the second taking at the enhanced value due to its proximity to the first taking. 288 So.2d 900 at 905-6.
There is ample evidence showing that acquisition of the 1959 servitude increased the values of property along the proposed highway. A Natchitoches Parish real estate broker testified it was difficult if not impossible to purchase land near the Mims properties along Louisiana Highway 1. He was willing to pay $51,000 for 1700 front feet along the 1959 servitude before the 1972 taking. James Mims testified that a number of people attempted to buy property fronting the 1959 servitude. The land was not sold only because landowners did not put it up for sale.
We will not burden the record by describing each of the eleven individual tracts and detailing the exact appraisals by the Department's and the landowners' appraisers. Suffice it to say that pastureland was appraised at $325 per acre by the Department and $375 by landowner. There is no manifest error in the trial court's acceptance of the $375 per acre appraisal. Twenty-one acres of the taken lands were pastureland.
The remaining parcels were appraised on an acreage basis by the Department's experts while landowners' experts divided it into timberland (appraised by the acre), and rural residential or rural commercial (appraised by the front foot). There is no manifest error in the trial court's acceptance of landowners' appraisal and rejection of the Department's. State, Department of Highways v. Pommier, 270 So.2d 274 (La.App. 3 Cir. 1972); State, *29 Department of Highways v. Wells, 298 So.2d 304 (La.App. 3 Cir. 1974).
The Department complains that Stephens was overly generous in his appraisal of several specific items takena shop was valued at $3,168 by Stephens while the Department's appraisals averaged $2,250; an old barn was valued at $669 by Stephens and the Department's experts considered it to be without value; fencing was valued at $1,495.65 by Stephens and the Department's appraisals averaged $1,000; a driveway was valued at $500 by Stephens and the Department's experts considered it to be without value. Stephens' appraisal was well documented and there is no manifest error in the trial court's acceptance of his opinion on these items.
The Department contends that Stephens appraised trees and shrubs at $3,000, but we find no separate allowance for trees and shrubs in Stephens' appraisal. He probably included that loss in his appraisal of the residential lot and the severance damages allowed to the residence, which is exactly what the Department contends should have been done.
The Department did not complain of Stephens' $1,200 appraisal for the taking of landowners' septic system.
The Department contends Stephens should not have allowed damages for the following items: $1,200 for a water well; $2,500 for a new cattle chute; and $4,300 for the Department's failure to replace Pampas grass, to relocate a residence and two sheds, to drill a new well, and to construct a drainage canal. Some of these items were required under the 1959 contract. It contends the $19,950 allowed for severance damages included these items. We don't find a duplication and fail to find manifest error in the trial court's award. Without these items the severance damages could have been substantially increased.

SEVERANCE DAMAGES
All experts agreed severance damages were sustained by landowners' home. Prior to 1972, Louisiana Highway 1 was located some 165 feet from their home; after the construction, the right-of-way was only 23 feet away. Prior to the taking, numerous large trees and shrubbery on the taken property insulated their home from problems created by highway traffic. Stephens assessed severance damages at $4,272.90 while one Department expert set the damages at $3,000 and the other at $4,218. There is no manifest error in the court's acceptance of Stephens' appraisal.
Stephens opined that landowners' pastureland suffered a $25 per acre diminution in value, or $19,950 in severance damages because it was impossible for cattle to cross from the 478 acre tract east of the highway to the 320 acre tract on the west. It was established at the second trial that, contrary to the Department's 1959 contract to provide an underpass, and contrary to the contractor's Intent to build one, an underpass was not constructed. James Mims testified that over the years this barricade, the highway, would increase the cost of his cattle operations by more than $180,000. Stephens' justification of this item of severance damages is well supported by the evidence.

LANDOWNERS' CLAIMS
Landowners seek to increase the trial court's award by $8,125, contending the Department moved 65,000 cubic yards of dirt from landowners' hill properties onto the low area. In addition to this 65,000 cubic yards of dirt, the contractor needed 375,000 cubic yards to build up the lower area; the contractor bought the latter amount from the Mims for $46,875. It is argued that when the contractor moved dirt from the highway servitude in the higher elevations to the lower area, landowners *30 were deprived of the opportunity of selling 65,000 cubic yards of dirt and should, therefore, be awarded $8,125 for that loss.
No authority has been cited; we know of none to prevent the Department from allowing its contractors to move dirt found on its servitude from high areas where it must be removed to low areas where it is needed. Landowners might as well have claimed damages because the Department had no place to store the excess 65,000 cubic yards of dirt found where the road had to be cut, and thus landowners were deprived of a loss of income by virtue of the Department's contractor finding another use for the dirt.
The trial court properly denied landowners' claim for the loss of $8,125 related to the alleged loss of their opportunity to sell 65,000 cubic yards of dirt.
Landowners also claim they will not receive just compensation for their taken land unless their attorney's $20,000 fee is assessed to the Department. They point to the fact that, as to cases filed after January 1, 1975, LSA-R.S. 48:453(E) permits an award of attorney fees to landowners when the court award exceeds the Department's deposit. Landowners review many factors which show this case to have been particularly onerousthe Department failed to comply with its obligations under its 1959 contract; it failed to negotiate in good faith with landowners for the 1972 takings by refusing to consider appraisals made by landowners' highly qualified appraisers.
Although it was established beyond doubt that landowners were required to employ an attorney to enable them to obtain the fair market value of their land, this is not the first case of its kind. Landowners admit the jurisprudence has uniformly denied attorney fees in these cases. This expropriation case was filed long before 1975, the effective date of the legislation allowing courts to grant attorney fees. There is no manifest error in the trial court's refusal to grant attorney fees. Knox v. Brown, 325 So.2d 295 (La.App. 3 Cir. 1976).

EXPERT FEES
Finally, the Department contends the $5,659.50 taxed to the Department for fees due landowners' six experts was exorbitant and contrary to the evidence. We disagree.
We distinguish State, Department of Highways v. Donner Corporation, 236 So.2d 841 (La.App. 3 Cir. 1970), cited by the Department. We agree with the holding that expert witnesses are entitled only to reasonable compensation for their appearance in court and for preparatory work done, and that their fees must be in line with those previously allowed in similar cases. LSA-R.S. 13:3666. The award of expert fees in this case is not contrary to that rule. In Donner, this court reduced expert fees of $4,755 and $6,209.50 to $2,250 each; landowner had been awarded some $17,700 more than the Department deposited for the taking. Here the $23,000 deposited was increased by almost $70,000. Stephens' bill was the largest of landowners' experts; he billed his time at $20 per hour in preparation and $125 for each day in court. The Department did not establish that Stephens did not spend time sufficient to justify his $2,060 bill.
The other experts did not document their time as thoroughly, but the trial court was impressed with their qualifications and testimony. Landowners' expert Lacaze filed a detailed and well documented report. His appraisals were slightly higher than Stephens'. His bill of $1,855 was in line with the work demonstrated by his report and testimony. A substantial part of the bill by landowners' experts was *31 made up of a $100 per day charged for attending court. We find that all expert testimony was relevant and useful to the court. The Department failed to establish manifest error in the fixing of expert fees.
Specific objection was taken to landowners' expert photographer's bill of $486. He charged $186 for his photographs and $300 for court appearances. The photographer was a professional and his services were far more valuable than those of an amateur. When photographs are helpful to the court, landowner is entitled to have his photographer's expert fee taxed as costs. State, Department of Highways v. Willet, 322 So.2d 383 (La.App. 3 Cir. 1975). There is no manifest error in the trial court's assessment of this expert fee.
The trial court judgment is amended to reduced the $98,190.89 judgment to $91,190.89. Otherwise the judgment is affirmed at the Department's costs. The Department's obligation to pay costs is subject to LSA-R.S. 13:4521.
AMENDED and AFFIRMED.
HOOD, J., dissents and will assign written reasons.
HOOD, Judge (dissenting).
I cannot agree with some of the conclusions reached by the majority.
These two consolidated expropriation suits were tried originally over a period of three days, June 7, 1973, and February 4 and 5, 1974. The trial judge assigned detailed written reasons for judgment on May 3, 1974, and in those reasons he carefully analyzed the appraisals made of each item of property taken, determined the value of each such item, and discussed and decided on several awards of damages which he felt should be made to defendants.
On August 27, 1974, the trial judge handed down an "amendment to original opinion," in which he determined that several other awards should be made to defendants, including separate awards for the value of a shop, a barn, fences, and a septic system which were included in the taking. He also made another (and I think a duplicate) award of severance damages to the residence occupied by defendants, and awards for the costs of digging a new well and performing drainage work on defendants' remaining property.
Pursuant to those reasons, the trial judge rendered judgment on September 3, 1974, in favor of defendants, condemning plaintiff to pay them the total sum of $56,250.02, subject to a credit for the amount which plaintiff deposited originally, and fixing the expert witness fees for the three appraisers who testified in behalf of defendants.
Plaintiff appealed, and on that appeal we reversed the above judgment and remanded both cases to the trial court, because we found that that court had erred in requiring the parties to exchange expert appraiser reports, in violation of LSA-C.C.P. art. 1452. See State, Department of Highways v. Mims, La.App., 311 So.2d 914 and State, Department of Highways v. Mims, La.App., 311 So.2d 921.
After being remanded, the cases were re-tried in the district court on September 4, 1975, and at that trial the parties, by stipulation, filed in evidence the entire record, including the transcript of the testimony which was taken at the original trial. Defendants also introduced some interrogatories which had been propounded to plaintiff, some photographs and the testimony of seven witnesses who had testified at the original trial. The evidence taken at the second trial was brief, the transcript consisting of only 29 pages, a substantial portion of which included (1) statements by counsel of the stipulations *32 they had entered into relating to the introduction of the record, (2) various "proffers of proof" of evidence which the trial court correctly ruled was inadmissible, and (3) the introduction of bills from six of the above witnesses for their services in appearing in court on that day. In my opinion, the evidence introduced at the second trial did not add to, enlarge upon, contradict or in any way explain or modify the evidence which was produced at the original trial. The judgment rendered after the second trial, therefore, was based on substantially the same evidence which formed the basis for the original judgment.
Following the second trial, the district judge rendered judgment increasing the award previously made to defendants from $56,250.02 to the sum of $98,190.89. He also increased the expert witness fees allowed the three appraisers who had testified for defendants, and he allowed expert fees to three other persons who testified at the original trial, although they did not give expert testimony. The trial judge handed down brief written reasons for that judgment, consisting of only three short paragraphs. The only reason assigned for the substantial increase in the awards made to defendants was that:
". . . the Court is of the opinion that the expert testimony of T. J. Stephens (one of the experts who testified for defendants) accurately and truly sets forth the values of the properties taken and all damages resulting from the taking. Accordingly, let there be judgment in favor of the defendants and against the plaintiff for the amounts set forth in the testimony of T. J. Stephens."
Both parties appealed from that judgment, and it is that appeal which is before us now. My colleagues have decided to reduce by $7,000.00 the amount awarded in the second judgment as the value of one of the items of property taken, and that had the effect of reducing the total award to the sum of $91,190.89. In all other respects, including the awards of expert witness fees, the majority affirms the opinion of the trial court.
I agree with my colleagues in the reduction of the amount awarded for one item of the property taken from $13,500.00 to $6,500.00. I cannot agree with them, however, as to several other awards made by the trial court after the second trial, and as to the expert witness fees allowed.
In my opinion, the trial judge assigned excellent reasons for the original judgment which was rendered in this suit. I would affirm all of the awards made in the first judgment, except an award of $4,000.00 for severance damage to the residence property, because I think the trial judge inadvertently included that award twice in his computations. In my view, the judgment appealed from here should be amended by reducing the total award from $98,190.89 to the sum of $52,250.02, and the amounts allowed as expert witness fees should be reduced as hereinafter shown.
No useful purpose would be served by discussing all of the awards which I think should be changed. Some of them, however, will be discussed.
Since the trial judge assigned no reasons for the awards made after the second trial, other than that he adopted the appraisal made by T. J. Stephens, we must look to the appraisal and testimony of Stephens to find the reasons why the trial court, after the second trial, almost doubled the awards which he originally found should be made.
Stephens, in his appraisal report made to counsel for defendants and thereafter filed in evidence, lists the following as one item of severance damages:
"The taking of the right-of-way leaves 468 acres on the east side of the new highway and 330 acres on the west side *33 making two (2) separate operations. It is the opinion of this appraiser that all the remaining land has been damaged because of this fact by $25.00 per acre on the 798 acres or a total damage this item ________________________$19,950.00"
The trial judge refused to make an award for that item in the first judgment, but he allowed the full $19,500.00 after the remand.
I find nothing in the testimony of Stephens which refers to this item of severance damages, except perhaps in one instance where he was asked whether there was anything in the "construction plans providing for any type of pass through in the bottom land from one side of the new construction to the other side of the new construction." His answer was: "Not that I could find."
The evidence shows that on September 10, 1959, defendants voluntarily executed a deed granting to the Department of Highways a right-of-way for construction of a highway across defendants' property, along the identical route over which the present highway is now being constructed. At the time that right-of-way was acquired, the Department planned to construct a two-lane highway along that route during the early 1960's. The two-lane highway was not constructed at that time, but by 1972 the Department decided that eventually it would have to construct a four-lane highway along the same route. These proceedings were instituted that year to acquire additional strips of land on each side of the original right-of-way, which would enable the Department to build the wider highway. Actually, following the 1972 taking, the Highway Department began constructing a two-lane highway over that route, and that construction work was being conducted at the time of the first and second trials. The plans, however, are to construct another two-lane thoroughfare later on the new widened right-of-way, thus making it a four-lane highway.
The 1959 right-of-way deed, executed voluntarily by defendants for a cash price and other considerations which they agreed upon, had the effect of severing their land, leaving 478 acres on one side and 320 acres on the other. The farm thus was severed in 1959, long before the 1972 taking occurred. The 1959 deed provided that the Department of Highways would construct fences along each side of the highway, obviously to keep defendants' cattle from wandering on the highway. A bridge was to be constructed spanning Bayou Pierre on defendants' property, and the fences were to extend to the bank of that bayou. The deed provided that the "Department shall install a standard driveway gate in the said fences to the right and left of the centerline at Bayou Pierre Bridge to enable to Grantors' cattle to cross beneath said bridge."
The trial judge held, and the majority agrees, that the 1959 right-of-way deed is still valid and binding. The Highway Department officials and representatives of the contractor testified that, although the construction work on the highway was still being conducted at the time of both trials, all of those parties were ready and willing at any time to install the gates required by the 1959 right-of-way deed at any locations specified by defendants, or to modify the fences in any way defendants decided to provide the pass-through. Mr. Daniel W. Bradford, Civil Engineer for the Department of Highways, testified at the first trial that he already had entered into the following agreement with defendants:
"I agreed with Mr. Mims to make a tie in to the fence, at the corner of the new bridge, Bayou Pierre bridge, to allow him to use that area under the bridge to move his cattle from one pasture to the other."
*34 Defendants alleged in their answer that "plaintiff refuses to furnish the defendants with a pass-through for their cattle." The uncontradicted evidence shows just the opposite. It establishes that defendants not only have been ready and willing at all times to furnish the pass-through, but that they specifically agreed with defendants prior to the first trial to construct the pass-through exactly as defendants wanted it done.
On this appeal defendants concede that the 1959 deed provides for the installation of gates in the fences to allow cattle to go under the bridge from one side of the highway to the other. They argue that they are entitled to severance damages, however, solely because the contract between the Highway Department and the contractor apparently contains no specific provision for the installation of those gates.
I find no merit at all to that argument. The Highway Department is bound by the 1959 agreement to install the gates, and it is ready and willing to do so at the places defendants want them installed. It is immaterial whether the Department has the present contractor perform that installation, or whether it has someone else do the work. The fact is that upon completion of the highway and bridge defendants will have the gates, or the pass-through, for their cattle exactly as they agreed upon in 1959. Their cattle raising operations thus will not be divided after the present construction has been completed. They at least will not be divided any more after that time than they would have been divided had the two-lane highway been built in the 1960's, as defendant agreed to when they executed the 1959 right-of-way deed.
If the majority feels that the Highway Department actually will not install the gates specified in the 1959 agreement, a conclusion which I think is totally unjustified, then instead of awarding $19,950.00 as severance damages, it seems to me that it would be more appropriate to simply order plaintiff to install the gates or to award defendants the cost of having them installed.
In any event, I cannot agree with the trial judge in the award of the above amount as severance damages, or with the decision of my colleagues to affirm such an award.
Mr. Stephens considered one item of property being taken, identified as Tract 2-3, to be homesite property, and he appraised it at $4,138.50. The trial judge, after the first trial, reduced the value of that tract to $787.50, assigning the following reasons for that reduction:
"After viewing the property itself, the Court is of the opinion that the property was too remote from the original highway at the time of the taking to be considered as possible homesites and too much dirt work would have to be done to prepare for residences. The Court is of the opinion that $350.00 per acre would be a fair and just compensation, and awards $787.50."
The district judge, without any additional evidence and without assigning reasons, increased the award to $4,138.50 after the second trial. I believe the judge was correct in the reasons which he assigned for the first judgment, and that the award should be reduced to $787.50.
Another item of property taken, identified as Tract 2-5, was appraised by Mr. Stephens at $2,300.00. The trial court reduced that award to $595.00, assigning as reasons therefor that "the court disagrees with Mr. Stephens that it would make a good homesite." After the second trial, and without assigning reasons, the trial judge increased the award to $2,300.00. I think he was correct originally, that he erred in later awarding the higher amount, and that the majority also erred in affirming the last award.
*35 In the first judgment rendered by the trial judge, the following expert witness fees were allowed to the three appraisers who testified in behalf of defendants:

Sam LaCaze, Jr. $1,665.00
T. J. Stephens 1,855.00
Henry Bernard 565.00

After the second trial, judgment was rendered allowing the following expert witness fees:

Sam LaCaze, Jr. $1,848.50
T. J. Stephens 2,060.00
Henry Bernard 665.00
Harry Friedman, Jr. 200.00
Rex Fair 400.00
James Davis 486.00

The three expert appraisers called by defendants did not give any additional expert testimony at the second trial, and I cannot agree with the trial court or with the majority that their fees should be increased substantially, simply because they appeared at the second hearing, apparently for the sole purpose of presenting another bill.
I also cannot concur in the allowance of expert witness fees to the other three witnesses, Friedman, Fair and Davis, since none of them gave expert testimony at the original trial or at the second trial. They were called at the second trial solely to be qualified and recognized as experts, and to submit a bill for their testimony in both trials. I will not agree to the allowance of expert witness fees under those circumstances.
I would reduce the expert witness fees allowed to LaCaze, Stephens and Bernard to the amounts which were specified in the first decree, and I would reverse that part of the judgment appealed from which allows any such fees to Friedman, Fair and Davis.
For these reasons, I respectfully dissent.

ON APPLICATION FOR REHEARING
MILLER, Judge.
As one of their reasons for requesting a rehearing, the Department of Highways refers to Article V, § 8(B) of the Louisiana Constitution of 1974, which provides in part:
However, when a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be reargued before a panel of at least five judges prior to a rendition of judgment, and a majority must concur to render judgment. (Emphasis added.)
We read the constitutional provision to require a five-judge panel when a district court judgment is to be modified or reversed and one judge dissents from the modification. In this case there is no dissent from the modification; the dissent agrees to the modification but would further modify the trial court's award.
The quoted portion of Art. V, § 8(B) is intended to give emphasis to trial court decisions in cases where two court of appeal judges differ with the trial court decision and the third appellate judge cannot agree to reverse or to modify the trial court judgment to the extent ordered by the majority. See C.C. 73 Verbatim Transcripts, Volume IX, p. 58, where the author of this constitutional provision explained the amendment; the five-judge panel is to apply when one judge dissents "and says you have done the wrong thing by reversing this district judge."
This is not the case before us. The dissent does not say the majority is wrong in modifying the district court judgment. It says the majority is wrong in not further modifying the trial court judgment.
*36 The two-judge majority modified the trial court judgment by reducing the amount awarded to the Mims from $98,190.89 to $91,190.89, a total reduction of $7,000. The dissenting judge agreed to that modification but would further reduce the trial court judgment by an additional $38,940.87. Therefore, all three judges on the appellate panel having agreed to modify the trial court judgment, with the dissenting judge voting to further modify that judgment. We do not believe the constitutional provision requires a five-judge panel for a case such as this, where a three-judge panel agrees to modify the trial court judgment to the extent set by the majority.
This case presents a situation analogous to Brown v. Employers Commercial Union Insurance Company, 316 So.2d 194 (La.App. 4 Cir. 1975), writ denied without reference to Art. V, § 8(B), 320 So.2d 204. In the Brown case, a majority of a panel of three modified the trial court judgment by reducing quantum; the dissenting opinion, in effect, agreed to that modification, for it would have reversed the trial court on the issue of liability and awarded nothing. The court of appeal addressed the issue of the applicability of Art. V, § 8(B), determining that this provision does not apply to a case in which none of the original appellate panel desires to have the trial court judgment affirmed. See 316 So.2d 194 at 198, footnote 4. The Supreme Court's denial of the writ, 320 So.2d 204, indicates approval of the rationale here expressed.
Finding no contrary guidelines, we refuse the request to allow a reargument to a panel of five judges.
HOOD, J., concurs in the refusal to allow a reargument before a panel of five judges, but feels that the application of plaintiff, State of Louisiana, for a rehearing should be granted.