433 So.2d 1129 (1983)
Curtis WILLIAMS and Willie Mae Hyman, Parents of the Deceased, John Henry Williams and Marion Portes Achee
v.
CITY OF NEW ORLEANS, New Orleans Public Service, Inc., and South Central Bell Telephone Co.
Nos. 0533, 0534.
Court of Appeal of Louisiana, Fourth Circuit.
June 8, 1983.
Rehearing Denied July 18, 1983.
*1131 C.B. Ogden, II, Thomas W. Milliner and Salvador Anzelmo, New Orleans, for defendants-appellants.
Eric M. Ferrouillet, Lolis Edward Elie, Elie, Ferrouillet & Ferrouillet, New Orleans, for plaintiffs-appellees.
Before GULOTTA, SCHOTT and CIACCIO, JJ.
CIACCIO, Judge.
These consolidated cases arose from two similar but separate incidents. Plaintiffs sued defendants praying for judgment in solido. A bifurcated trial was conducted, wherein the case against defendant-appellant, New Orleans Public Service, Inc., was tried by a jury and the case against defendant-appellant, the City of New Orleans, was tried by the judge.[1] See La.R.S. 13:5105. Both jury and judge rendered verdicts in favor of plaintiffs and against their respective defendants. Defendant NOPSI filed a rule for remittitur and, alternatively, for a new trial which was dismissed by the trial court. The trial court entered judgment in accordance with the verdicts and defendants appeal. We amend and affirm.
On May 3, 1978, the intersection of Lake Forest Boulevard and Bundy Road was flooded due to heavy rain. A City of New Orleans one-way street sign stanchion located at this intersection became electrified by contact with an underground electric cable which was installed, maintained and operated by NOPSI. Plaintiff, Marian Achee, was injured when she touched the stanchion at approximately 12:00 noon. John Williams, son of the other plaintiffs, was electrocuted at the site at approximately 2:30 P.M.
The jury found NOPSI liable and awarded Mrs. Willie May Hyman, mother of John Williams, $302,632.00[2]. The jury awarded Mrs. Achee $125,000.00. The trial judge made the jury verdicts judgments of the court. The trial judge rendered judgments against the City of New Orleans in the amounts of $90,000.00 in favor of Mrs. Hyman and $125,000.00 in favor of Mrs. Achee. These judgments do not contain any reference to indicate joint or severable liability as between the City and NOPSI.
Both appellants raise essentially the same issues on appeal. Each appellant argues that the other should have been held solely responsible, i.e., each appellant argues the error of the verdict against it. Secondly, both appellants argue that the awards to plaintiffs were excessive. Lastly, appellants argue that if they are liable, the judgment should indicate whether they are jointly liable. Appellees also assign error, arguing that the awards were deficient.

NEGLIGENCE OF NOPSI
Plaintiffs argued at trial that NOPSI was negligent for installing the cable at a depth of only 18 inches without providing any supplemental protection. NOPSI argued that this type installation had been standard procedure for 25 or 30 years and no similar accident had occurred.
The cable in question supplied electricity to the street lights along Lake Forest Boulevard. The cable was laid pursuant to a contract between NOPSI and the City. Under the terms of that contract, NOPSI undertook the responsibility for the engineering and drawing of design plans for the laying of street light circuitry. NOPSI used its own in-house electrical engineers to draw up the plans and specifications for laying the cable. The actual construction work was performed by a subcontractor. A *1132 NOPSI assistant director of engineering testified at trial that in May of 1978 the cable was owned by NOPSI.
To determine whether tort liability exists under the facts of a particular case, the Louisiana Supreme Court has adopted a duty-risk approach. Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La.1976); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Dixie Drive It Yourself Systems v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962).
The duty risk analysis involves answering the following inquiries: (1) Was NOPSI's conduct a cause-in-fact of plaintiffs' accidents? (2) What, if any, duty was owed by NOPSI to the plaintiffs? (3) Was the risk, and harm caused, within the scope of protection afforded by this duty? (4) Was there a breach of this duty? See: Allen v. Housing Authority of New Orleans, 423 So.2d 1291 (La.App. 4th Cir.1982) and Coleman v. Douglas Public Service, Inc. et al., 423 So.2d 1205 (La.App. 4th Cir.1982).
In determining cause-in-fact we make no inquiry as to whether defendant's conduct was unlawful or negligent. Cause-in-fact is a necessary logical antecedent without which the accident would not have occurred. These accidents would not have occurred in the absence of the cable which NOPSI had installed. Installation of the cable by NOPSI was a cause-in-fact of the accidents.
NOPSI has a duty to use reasonable care in the installation, operation and maintenance of their electric lines, and will be responsible for any conduct falling short of this standard. NOPSI must provide protection which safely guards against any contingency that can be reasonably anticipated. The degree of care which satisfies this duty varies with the danger which will be incurred by negligence and must be commensurate with the danger involved. Calton v. Louisiana Power & Light, 56 So.2d 862 (La.App. 2d Cir.1952). Recognizing NOPSI's duty, we find that the scope of protection afforded by this duty encompassed the protection of private citizens, such as the plaintiffs, from the risk of harm caused by accidental contact with charged electric lines.
Clearly, NOPSI owed a duty to these plaintiffs. The final decisive inquiry is whether NOPSI breached its duty. Much expert testimony was presented by plaintiffs as well as defendants concerning the applicability to the facts of this case of the National Electric Safety Code (1973 edition). The Code sets forth the purpose of its recommendations as "the practical safeguarding of persons from hazards arising from the installation, operation and maintenance of underground or buried supply and communications lines and associated equipment. It [Part 3 of the Code] contains basic provisions considered necessary for safety." While with regard to underground electric lines, this Code has not been adopted by any law or ordinance as a safety standard, the Code should be given whatever probative weight the trier of fact finds it warrants. Burley v. Louisiana Power & Light, 319 So.2d 334 (La.1975).
For electric cable carrying 600 volts or less the Code provides for a burial depth of 24 inches. Prefacing the recommended burial depths the Code states, "The distance between the top of a cable and the surface under which it is installed (depth of burial) shall be sufficient to protect the cable from injury or damage imposed by expected surface usage." The Code further provides that burial depths less than those recommended "may be used where supplemental protection is provided."
The Code also provides that these rules may be waived or modified by the proper administrative authority. NOPSI argues that they complied with the Code because their construction plans were approved by the Department of Utilities and this approval was a waiver as contemplated by the Code. We do not agree. The City Charter indicates that the proper administrative authority from whom to seek a waiver would have been the City Council or possibly the Department of Safety and Permits. See: Home Rule Charter of the City of New *1133 Orleans Art. III and Art. IV Chapter 7. The City Charter empowers the Department of Utilities to recommend, supervise, investigate and make reports. This department is not a regulating authority with the power to waive or modify safety requirements. See: Home Rule Charter of the City of New Orleans Art. IV Chapter 16. Expert testimony at trial also indicated that a waiver should have come from the City Council. NOPSI did not seek a waiver from the City Council or the Department of Safety and Permits. Furthermore, a reading of the letter approving the construction plan reveals that the approval was for the location of the light standards, not the burial depth of the cable.
The cable in question carried between 120 and 125 volts of electricity. It was a copper conductor, American Wire Gauge No. 6, with 3/16 of an inch insulation of polyvinyl chloride. Other than the insulation around the wire, the only protection for the cable was the burial depth of 18 inches. The insulation was designed to protect against soil and rocks. It was not designed to protect against equipment which might pierce it. No supplemental protection was provided for this cable.
A registered consulting electrical engineer, in the profession since 1959, testified as an expert at trial concerning the Code and its application to this case. He pointed out the historical development of the Code as "an attempt to put into writing the knowledge that has been gained throughout the country by engineers, experts in these areas." It was his opinion that "the Code represents a minimum standard of good engineering judgment." Further expert testimony was offered that at a burial depth of only 18 inches some type of supplemental protection should have been provided. Expert testimony also indicated that the placing of street signs should have been considered and anticipated as "expected surface usage."
Other expert trial testimony contradicted the expert opinions referred to above. There was expert testimony which indicated that NOPSI had exercised good engineering judgment in the installation of the cable and had not done anything improper. The trier of fact may, and should, assess the credibility of experts who testify at the trial, to determine the most credible and realistic evidence. After weighing and evaluating all of the evidence, the trier of fact may accept or reject the opinion expressed by any expert depending upon how he is impressed with the qualifications and testimony of that expert. Guidry v. Davis, 382 So.2d 250 (La.App. 3d Cir.1980); Lewis v. Orleans Parish School Board, 371 So.2d 328 (La.App. 4th Cir.1979).
Plaintiffs apparently convinced the jury that these accidents would not have happened if the cable had been buried at least 24 inches deep or if supplemental protection had been provided. The jury must have further decided that the provisions of good engineering judgment set forth in the Code represented the minimum standards of reasonable care. NOPSI's failure to provide supplemental protection or to bury the cable at the minimum depth recommended by the Code, must have led the jury to conclude that NOPSI breached its duty to use reasonable care. Our review of the record does not disclose that under the particular facts of this case that this conclusion is manifestly erroneous. Carter v. Koehring Company, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We, therefore, affirm the jury's finding of liability.

NEGLIGENCE OF THE CITY OF NEW ORLEANS
The City argues that under the terms of its contract with NOPSI, the sole responsibility for damages rests upon NOPSI. We disagree. The pertinent portions of the contract read as follows:
"[NOPSI] shall also design, furnish installed, or install for the account of City, special installations and shall maintain, operate and/or furnish electric energy for the units of special installations, and shall be solely responsible for the design, installation, maintenance and operation of the entire street lighting system as covered *1134 under the terms of this Contract." (Emphasis added)
and in another section of the contract,
"[NOPSI] shall indemnify and save harmless, City from all suits and actions that may be brought against it by reason of any injury or alleged injury to the person or property of another resulting from negligence or on account of any act of commission or omission on the part of [NOPSI], its representatives or employees in supplying the services provided for herein."
By these terms of the contract NOPSI assumed exclusive authority and responsibility for installation, maintenance and operation of the street lighting system. NOPSI further agreed to assume responsibility, vis-a-vis the City, for the negligence of NOPSI, its representatives or employees. A clear reading of the contract indicates that NOPSI did not assume responsibility for any damage caused by any acts of commission or omission on the part of City employees.
The trial court found that the City acted negligently by installing the one-way sign without first making any attempt to locate the underground cable. The record reflects that the City workers who install traffic signs are simply cautioned to watch out for underground wires. They receive no electrical training. They are not made aware of areas with underground cables except through the coincidental knowledge of someone in the department or, as was the case here, the observation of a line of light standards and the absence of any overhead wiring.
The City had been provided with the drawings which indicate the location of the cable in question. The City workers from the department responsible for installing street signs testified that these drawings were not consulted. The standard procedure was for the workers to guess a location that would miss the underground cable. The workers might, for example, line up the light standards, assume the cable runs directly from one to the other and install the sign where they hope the cable will not be hit.
The workers further testified that NOPSI is not consulted to help locate underground cable. NOPSI is called only if they happen to hit a cable while installing a sign, an occurrence of some regularity. The workers in this case were unaware that a cable had been contacted.
As the First Circuit has stated with respect to the City of Baton Rouge and a similar situation:
.. The City must exercise more care in the installation of signs in areas where it is known underground cables exist. The record reflects the standard practice at the time of the accident was to give complete discretion to the workers who installed the sign. The risk of making contact with an underground cable is a serious one, therefore it is simply not reasonable to allow this much discretion to laborers who have no training in the area of electricity.

Olinde v. State of Louisiana et al, 391 So.2d 1243 (La.App. 1st Cir.1980).
The City of New Orleans employees did not even attempt to locate the underground cable. No precautions were taken. The workers were given no supervision in the matter and were allowed simply to guess. Such a lack of care falls below the standard of a reasonable person. We will not disturb the trial judge's finding of liability.

APPORTIONMENT OF DAMAGES
Having affirmed the findings of liability as to each defendant, we must now address the issue of the apportionment between the defendants of any damages.
Certain results, by their very nature, are obviously incapable of any logical, reasonable or practical division. Death is such a result.... No ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and if so, each must be charged with all of it. * * * The duties which are owed to the plaintiff by *1135 the defendants are separate, and may not be identical in character or scope, but entire liability rests upon the obvious fact that each has contributed to the single result, and that no rational division can be made.
"* * * It is not necessary that the misconduct of two defendants be simultaneous. One defendant may create a situation upon which the other may act later to cause the damage. * * * If a defendant is liable at all, he will be liable for all the damage caused."
William L. Prosser, Handbook of the Law of Torts 52 (4th ed. 1971). "* * * Under Article 2315 of our Civil Code, as interpreted by an unbroken line of jurisprudence, any act or omission of a legal duty which is a proximate cause of an injury to another, renders the party charged with such act or omission liable in damages. In the case of a joint tortfeasor it is not necessary that the act or failure in the performance of duty be the sole cause of the accident or injury; it is enough that it is a contributing cause."

Lee v. City of Baton Rouge, 243 La. 850, 147 So.2d 868 (1962).
"* * * Where the negligence of several persons, whether their joint negligence or their separate negligence combines to form the proximate cause of an accident, the negligence of each one of them is one of the proximate causes of the accident, and he is liable to anyone who suffers injury to his person or damage to his property as a result thereof. Arnold v. Griffith, La.App., 2 Cir., 192 So. 761, 763." Russo v. Aucoin et al., 7 So.2d 744 (La. App. 1st Cir.1942).
Under the reasoning of the authorities cited above and La.C.C.Arts. 2315 and 2324 (as this article existed prior to its amendment in 1979), defendants are answerable to plaintiffs in solido. The judgments of the trial court shall be amended to reflect in solido liability.

QUANTUM
Appellants argue that the amounts of the damages awarded are excessive. Appellees argue the inadequacy of the awards.
About mid-morning on May 3, 1978, Mrs. Achee was encouraged by her employer to leave work early to go home before the torrential rains flooded the streets making them impassable. After her car stalled, Mrs. Achee waded through the flood waters in an effort to reach her home. At the intersection of Lake Forest Boulevard and Bundy Road she reached for a sign post to steady herself as she was approaching the curb. When she grabbed the sign post she was jolted by the electricity. She testified that she started screaming and trying to pull her hand away, but it was as if her hand was glued to the pole. She continued to scream for help and somehow her hand pulled free. She was thrown back away from the pole and landed on her back and arm in the water on the cement. She testified that she was shaking and that nothing compared with the pain she felt. The fall had torn her blouse and she had to crawl out of the water to an elevated portion of the grass. She could not continue to travel home and telephoned her son for assistance. Her son arrived and brought her to the hospital.
The remainder of Mrs. Achee's testimony outlined her constant physical difficulties following the accident. On the day of the accident she received emergency room treatment and black and blue marks began to appear on her arms and hands. She was not hospitalized and the next day contacted her doctor who prescribed valium and warm baths. In June of 1978 she contacted another doctor complaining of headaches for which he prescribed valium and a sinus preparation. Neither of these doctors testified at trial.
Mrs. Achee's difficulties persisted and in January of 1979 she was referred to Dr. Ruel, an orthopedist, whom she visited in March. Dr. Ruel was the first specialist to examine Mrs. Achee. Following his examination he hospitalized her to be placed in cervical traction. Her hospital stay lasted 10 days. Her condition worsened following discharge and she was referred to Dr. Richardson, a neurosurgeon, for surgery.
*1136 Dr. Richardson performed a myelogram test which revealed that Mrs. Achee had a herniated disc at the C5 level. Mrs. Achee was rehospitalized and Dr. Richardson performed a cervical disc fusion. Dr. Richardson discharged Mrs. Achee in October of 1979.
Mrs. Achee testified that following her discharge from Dr. Richardson she tried to work at several jobs. She was unable to remain employed, however, because of the pain and discomfort she was experiencing. She again sought medical attention and was referred to Dr. Bratton, a neurosurgeon.
Dr. Bratton first saw Mrs. Achee in May of 1980. Upon examining her, he felt that she may have experienced additional disc degeneration in the disc below the fusion site. Mrs. Achee was rehospitalized for cervical traction and physical therapy. She also underwent a second myelogram. Dr. Bratton discharged Mrs. Achee in June of 1980 advising her to seek conservative care. He advised against a second surgery without first attempting therapy.
Mrs. Achee underwent regular chiropractic treatment coupled with medication to alleviate the pain. After many visits to the chiropractor, Mrs. Achee again sought the care of Dr. Bratton in February of 1982. Dr. Bratton took flexion x-rays which revealed that the fusion had not become completely solid. The only relief Dr. Bratton could offer was additional surgery, which would be more complicated and inherently more dangerous because of the scar tissue already present. Mrs. Achee decided to continue conservative care because of the dangers of surgery. Dr. Bratton testified that he suspects that eventually she will no longer be able to tolerate the pain and will elect to undergo surgery.
At NOPSI's request Dr. Levy, a neurosurgeon, examined Mrs. Achee in February of 1982. His examination revealed slight limitation of neck movement and some numbness on the fingers of the right hand. X-rays showed some movement in the fused area. Dr. Levy found Mrs. Achee normal in all other respects and felt she had no neurological reasons for the pain.
At trial, defendants presented evidence that Mrs. Achee had been involved in a serious automobile accident in February of 1980 and suggested that she had been beaten by her husband on at least three occasions following the May 3, 1978, accident and prior to her first visit to Dr. Ruel in January of 1979. Defendants questioned the doctors who testified as to the causal connection of these other incidents with Mrs. Achee's complaints. Defendants also questioned Mrs. Achee's delay in seeking specialized medical attention and her failure to call as trial witnesses the first two doctors she had contacted. All of this evidence was presented to the jury and the judge.
Mrs. Achee was awarded $125,000.00 by both the jury and the judge against their respective defendants. Appellants argue that the evidence did not establish a causal connection between Mrs. Achee's accident on May 3, 1978, and the injuries for which she sought recovery at trial. Whether a causal connection exists is a factual question. Both judge and jury reached the same conclusion and found a causal connection between the accident and the injuries complained of at trial. We have reviewed the record and find that this conclusion is not "clearly wrong." The findings on this issue by both judge and jury, therefore, will not be disturbed. Canter v. Koehring, supra; Arceneaux v. Domingue, supra.
The law accords the trier of fact "much discretion" in awarding damages. La.C.C. Art. 1934(3). We will not disturb the award absent an abuse of that discretion. Wilson v. Magee, 367 So.2d 314 (La. 1979). We find no abuse of discretion. Amending the judgment, as discussed above, to reflect the in solido liability of defendants, we affirm the award in favor of Mrs. Achee for $125,000.00.
Because of the different requirements of La.R.S. 13:5105 and the Constitution of the State of Louisiana, this case was submitted to two separate fact finders. While plaintiffs have a constitutional right to have their claims against NOPSI determined by *1137 a jury, claims against the City must be heard by a judge sitting without a jury. See: La.R.S. 13:5105.
Different fact finders can and do come to different conclusions from the same evidence. This possibility is inherent in every bifurcated trial involving a governmental and a non-governmental tortfeasor. Different conclusions were reached in this case. Mrs. Hyman was awarded $302,632.00 by the jury against NOPSI, and was awarded $90,000.00 by the judge against the City of New Orleans for the same elements of damage.
In Thornton v. Moran, 343 So.2d 1065 (La.1977) the Louisiana Supreme Court instructed the appellate courts, in situations such as this, "to resolve the differences in the factual findings between the jury and the judge ... and to render a single opinion based upon the record." The Supreme Court mandate did not provide a standard of review and the different circuit courts have not chosen the same standard. The First Circuit has chosen a "more reasonable measurement" standard, that is, which of the triers of fact reached the more reasonable conclusion. Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.1977); writs refused 350 So.2d 897 ("No error of law."), 898 ("The result is correct.") and 900 ("The result is correct.") (La.1977). The Fourth Circuit reasoned, in a later case,
On appeal neither trier of fact is entitled to have greater weight accorded to its factual findings. Therefore, it is necessary for the appellate court to make its own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent. (footnote omitted).

Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223 (La.App. 4th Cir.1978), writ denied 365 So.2d 242 (La.1978).
In Deville v. Town of Bunkie, 364 So.2d 1378 (La.App. 3d Cir.1978) writ denied, 366 So.2d 564 (La.1979), the approach of the Third Circuit is more in line with the "more reasonable" standard. The Third Circuit, however, cites Thornton v. Moran, supra, and Aubert v. Charity Hospital of Louisiana, supra, as authority for its approach.
Although aware of this divergence of views, we presently feel bound to follow that standard previously enunciated by this court in Aubert v. Charity Hospital of Louisiana, supra, i.e., to make our "own independent factual findings based on the record, without according any weight to the factual findings of either the judge or the jury when those findings are inconsistent."
The elements of damage for wrongful death are loss of love, affection and companionship, loss of support and funeral expenses. Walker v. St. Paul Insurance Companies, 339 So.2d 441 (La.App. 1st Cir.1976). A stipulation was entered into during the trial that funeral expenses amounted to $2,632.00. We must now look to the evidence in the record to determine loss of support and loss of love, affection and companionship.
At the time of his death, John Williams was in his early twenties and his mother, Mrs. Hyman, was 54 years old. John Williams lived in New Orleans and his mother lived in Memphis. He had come to New Orleans to attend SUNO on an athletic scholarship and remained following graduation seeking employment opportunities.
To be compensated for loss of support a plaintiff must show actual prior monetary support. Ogaard v. Wiley, 325 So.2d 642 (La.App. 3d Cir.1976). Trial testimony indicates that for most of his life John Williams had shared whatever money he earned with his mother. The evidence further indicates that within the recent past before his death John Williams had been sending his mother $200.00 a month. Witnesses testified that these gifts were expected to continue and probably increase.
An expert witness qualified in the field of economics and statistics testified on Mrs. Hyman's behalf. He testified that the amount presently needed to furnish Mrs. Hyman with $200.00 per month over the course of her life expectancy from the time of the accident, discounted at a rate of 7½ and allowing for no inflation, would be $35,236.00. *1138 We find this amount to be an appropriate award for loss of support.
Mrs. Hyman and others testified to the special character of John Williams. Mrs. Hyman maintained that of her eleven children, John was her favorite child. The testimony of numerous individuals indicates that John Williams was looking forward to a promising future. He was a recent graduate of Southern University of New Orleans where he had been a basketball star and a scholar.
Dr. Walter Austin, head of the Division of Business at SUNO, referred to John Williams as "one of the finest human beings I have ever known." Cirilo Manego, the basketball coach at SUNO, remembered John as an intelligent, likable person with a good ability to relate to others. He also considered John an outstanding ball player, the key to the team and a professional prospect having received inquiries about playing professional basketball in Europe. John's brother confirmed that John was pursuing a professional basketball career by looking into a summer league in Los Angeles which had sent him letters.
Persons acquainted with John Williams' employment history testified to his exceptional industry as an employee. The evidence also indicates that a week prior to his death, John had contracted to begin work at a new job with an increase in pay.
Mrs. Hyman was most proud of her son and his vigor for life. John was her very special child. This fact was verified by a brother and sister who testified at trial. John was the only one of Mrs. Hyman's children who had finished college. He had been closer to his mother than any of the other children, always taking time to talk with her and do things for her. He always remained in close contact with his mother, even when they lived apart. He continually concerned himself with his mother's comfort, working to repair her house and striving to some day buy her a "dream house." John Williams was described as the glue that held his family together and made his mother happy to be alive.
The very close relationship between John Williams and his mother was one of exceptional love, affection and companionship. Mrs. Hyman suffered a severe and tragic loss when her son was accidentally killed.
Appellants argue that the maximum award which can be given a surviving parent for the loss of love, affection and companionship of a child is $50,000, citing the following cases: Walker v. St. Paul Insurance Co., 343 So.2d 251 (La.App. 1st Cir.1977), $40,000 to each parent; Weathersby v. Kersbergen, 356 So.2d 498 (La.App. 1st Cir.1977), $25,000; Hebert v. Missouri Pacific Railroad Co., 366 So.2d 608 (La.App. 3d Cir.1979), writs denied, 369 So.2d 155, $45,000; Williams v. State of Louisiana, 349 So.2d 1275 (La.App. 1st Cir.1977), $50,000 for loss of an only child; Moore v. Travelers Ins. Co., 352 So.2d 270 (La.App. 2d Cir. 1978), writ denied, 354 So.2d 1049, $20,000; Bryant v. Travelers Ins. Co., 307 So.2d 749 (La.App. 1st Cir.1975), $25,000 to each parent; Parks v. Liberty Mutual Ins. Co., 291 So.2d 505 (La.App. 2d Cir.1974), writs denied, 292 So.2d 240, $35,000. We have reviewed these cases and others concerning amounts of prior awards. We find that under the particular facts of this case, with Mrs. Hyman acting as both mother and father since John Williams was two years old, the demonstrated exceptional character of John Williams and the extraordinary bonds of love, affection and companionship which existed between mother and son, that an award is warranted in the amount of $150,000.00.
We award Mrs. Hyman, therefore, a total of $187,868.00 against defendants in solido.

DECREE
Accordingly the judgments as to the findings of liability by the jury and the judge against NOPSI and the City of New Orleans are affirmed. The judgments in favor of Mrs. Achee are amended to cast NOPSI and the City of New Orleans in solido, and as amended are affirmed awarding her $125,000.00. The judgments in favor of Mrs. Hyman are amended to cast *1139 NOPSI and the City of New Orleans in solido for the amount of $187,868.00.
AMENDED AND AFFIRMED.
SCHOTT, J., dissents in part and assigns reasons.
SCHOTT, Judge, dissenting in part:
I respectfully dissent from that part of the majority opinion which affirms the judgments against NOPSI. In discussing whether NOPSI's conduct was a cause-in-fact of plaintiffs' accident my colleagues say that since the accidents would not have happened in the absence of NOPSI's cable; the installation of the cable was, therefore, a cause-in-fact of the accidents.
No one suggests that the installation of the cable in itself was the negligent conduct giving rise to these causes of action. The negligent conduct charged against NOPSI is the installation of the cable only 18 inches deep instead of at least 24 inches deep. The first question to be answered is whether this shallow installation was a cause-in-fact of the accident.
Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm, and if the accidents would have occurred regardless of NOPSI's negligence it was not a substantial factor or cause-in-fact. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
The city employees drove the metal stanchion four feet into the ground. Therefore, even if NOPSI had not been negligent and had installed the cable 24 inches deep the accidents would have occurred anyway. Thus, NOPSI's negligent conduct in installing the cable only 18 inches deep was not a cause-in-fact of the accidents.
The third inquiry made by the majority in the duty-risk analysis is, "Was the risk, and harm caused, within the scope of protection afforded by this duty?" Here again, the specific duty breached by NOPSI was the placement of the cable at least 24 inches deep without supplemental protection. In the Dixie case the court postulated the question as follows:
".... Specifically, it involves a determination of whether the statutory duty of displaying signal flags and responsibility for protecting traffic were designed, at least in part, to afford protection to the class of claimants of which plaintiff is a member from the hazard of confused or inattentive drivers colliding with stationary vehicles on the highway."
Paraphrasing this language to fit the instant case, we must determine whether NOPSI's duty to bury the cable at least 24 inches deep was designed to protect our plaintiffs from the hazard of someone driving a metal stanchion four feet into the ground. Obviously, it was not. Had the stanchion been driven between 18 and 24 inches down the risk of puncturing the cable at this depth would have been within the scope of protection intended by the requirement to bury the cable at least 24 inches deep, but had NOPSI complied with the standard or gone way beyond its duty by burying the cable almost four feet deep the accidents would have occurred anyway.
Because I would dismiss plaintiffs' suit against NOPSI I would confine my inquiry on quantum as to whether the trial judge abused his discretion in the amount of his award against the City. Since I find none I would affirm the judgments entered by the trial court of $125,000 and $90,000 against the City.

ON APPLICATION FOR REHEARING
PER CURIAM.
As one of its reasons for requesting a rehearing, New Orleans Public Service, Inc. refers this court to Rule 1-5 of the Uniform Rules-Courts of Appeal, which states:
"... in civil appeals when a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be reargued or resubmitted before a panel of at least 5 judges, a majority of whom shall render judgment...."
The source of Rule 1-5 is Art. 5 § 8(B) of the Louisiana Constitution of 1974. This constitutional provision has *1140 been interpreted to require a five judge panel when a district court judgment is to be modified or reversed and one judge dissents from the modification. State, Dept. of Highways v. Mims, 336 So.2d 24 (La.App. 3d Cir.1976). This court has held this provision inapplicable when a majority affirms a finding of liability, the dissenting opinion addresses itself to the issue of liability and the modification of the trial court's judgment by the majority involves a reduction in quantum. Brown v. Employers Commercial Union Insurance Company, 316 So.2d 194 (La.App. 4th Cir.1975), writ denied, 320 So.2d 204 (La.1975). In the Brown case, a majority of a panel of three modified the trial court judgment by reducing quantum; the dissenting opinion, in effect, agreed to that modification, for it would have reversed the trial court on the issue of liability and awarded nothing.
With respect to NOPSI, the instant case is similar to the Brown case. The majority has affirmed the trial court judgment's finding of liability. One judge dissents and would find no liability. The majority has reduced the quantum award against NOPSI. The dissenting judge would, in effect, make no award against NOPSI.
Following the reasoning of Brown v. Employers Commercial Union Insurance Company, supra, and State, Dept. of Highways v. Mims, supra, we hold that there is no basis to submit this case to a five judge panel. See also: Speirer v. McIntosh, 342 So.2d 238 (La.App. 4th Cir.1977) and Welton v. Falcon, 341 So.2d 564 (La.App. 4th Cir. 1976).
Further, as to all other issues, a rehearing is refused.
NOTES
[1] Defendant South Central Bell Telephone Co. was dismissed with prejudice early in the proceedings without objection from any party.
[2] Neither jury nor judge made any award to Curtis Williams, father of John Williams, presumably because they heard testimony that the father had not seen his son since he was two years old.