GRISBAUM, Judge.
This appeal concerns a dispute between a worker’s compensation insurer and a third party tortfeasor (and his insurer) over reimbursement for compensation and other benefits paid to the injured worker. The compensation insurer-intervenor, St. Paul Fire & Marine Insurance Company, appeals the trial court’s award of $30,000 for its reimbursement. We amend, and as amended, we affirm.
We are called upon to decide two basic issues:
(1) Whether the hospital incident was the separate, independent, and intervening act which caused the rupturing of the disc, and
(2) Whether the trial court erred in failing to award legal interest to the inter-venor-compensation insurer.
FACTS
On August 9, 1983, Eddie J. Veal, Jr., in the course and scope of his employment with Bonnabel Hospital, was driving a van owned by the hospital. The van was struck by a pickup truck driven by Robert Dwyer and owned by Dwyer’s Quality Used Cars, Inc. That day, Veal reported to his supervisor that he was experiencing pain but continued working in pain for the next few days. While pushing a stretcher at the hospital on August 14, 1983, he experienced a sharp pain down his right arm to his fingertips. The next day he saw Dr. Bert Bratton and on September 20, 1983 began collecting $117.33 per week compensation benefits.
On July 27, 1984, Veal filed suit seeking damages for injuries sustained and named as defendants Dwyer, Dwyer’s Quality Used Cars, Inc., and its liability insurer, Continental Insurance Company. St. Paul Fire & Marine Insurance Company (St. Paul), Bonnabel Hospital’s worker’s compensation carrier, intervened seeking recovery of compensation benefits and medical expenses paid to Veal. Prior to trial, Veal had been paid a total of $53,656.67 in benefits and $9,901.78 in medical expenses, apparently pursuant to a lump sum settlement. On March 17, 1986, the parties settled the main demand, to which St. Paul was not a party and did not assent, for a sum of $150,000. The settlement included an agreement that any sums awarded in the intervention were to come out of the $150,000 placed in escrow until the intervention was determined. The next day, the intervention was tried and judgment was rendered in favor of St. Paul for $30,000. Although the judgment omitted interest, St. Paul was ordered to pay all costs of the proceedings, along with the expert fee of $500.
ANALYSIS
The rights of an employee and his employer against a third party tortfeasor are governed by La.R.S. 23:1101-03. Briefly, these provisions permit both the employee and the employer or its insurer to file a tort suit against third persons who caused the employee’s injuries. Section 1101. If either party brings suit, he must notify the other, and the other may intervene in this suit against the third person tortfeasors. Section 1101. In the event of successful recovery in such a suit, the employer’s claim for reimbursement of compensation shall be paid in priority to the employee’s claim out of any amount recovered. Section 1103. See Johnson v. Fireman’s Fund Ins. Co., 425 So.2d 224 (La.1982); *886 Verbois v. Howard, 322 So.2d 110 (La.1975). Moreover, Section 1103 concludes specifically: “No compromise with such third person by either the employer or the injured employee or his dependent shall be binding upon or affect the rights of the others unless assented to by him.” Accordingly, the plaintiffs settlement does not prejudice the right of the intervenor to recover all sums for reimbursement of compensation to which it is entitled, providing the damages sustained by the plaintiff as a result of the tort are at least equal to such amount. Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981); Verbois v. Howard, supra. This is so regardless of any “hold harmless” provision to which the settling parties may have agreed. La.R.S. 23:1102(C)(1); Security Ins. Co. of Hartford v. Deshotels, 458 So.2d 186 (La.App. 5th Cir.1984).[1]
It is an axiomatic rule of law that in a worker’s compensation case, an employee (or, as here, the intervening carrier) must establish by a preponderance of the evidence that an employment accident, more probably than not, caused the disability. Conley v. Avondale Shipyards, Inc., 464 So.2d 807 (La.App. 5th Cir.1985). We have further recognized that an “accident” does not necessarily mean a sudden, violent and traumatic event; a claimant may also demonstrate that the disability was caused by activity gradual and progressive in nature. Millet v. Hooker Chem. Co., 442 So.2d 1239 (La.App. 5th Cir.1983). More importantly, when a determination must be made as to which of two accidents is the legal cause of the disability, various tests have been verbalized in our jurisprudence. In Waggoner v. Marquette Casualty Co., 181 So.2d 475 (La.App. 2d Cir.1965), the legal framework was set forth thusly:
“ ‘A tort-feasor is liable only for the direct and proximate results of his wrongful act. He cannot be held responsible for the result of a separate, independent and intervening act with which he had no active connection. If a person receives an injury through the negligent act of another, and the injury is after-wards aggravated and recovery retarded by a subsequent accident not resulting from the failure of the injured person to use ordinary care, the subsequent accident becomes a sequence or natural result of the original injury and the tort-feasor is liable for the entire damage sustained. However, the reverse is true if the subsequent injury is attributable to a distinct, intervening cause, for which the tort-feasor would be liable only for the original injury and not the subsequent one.’ ” (quoting from Rainwater v. Timothy, 87 So.2d 11 (La.App.Orl.Cir.1956)).
Waggoner, supra at 478-79. More recently, the test was succinctly stated as follows: “The proper standard for determining whether an accident is the legal cause of the disability is simply whether the accident changed the plaintiff’s condition so as to render him disabled and unfit for his former employment.” Abshire v. Dravo Corp., 396 So.2d 521, 524-25 (La.App. 3d Cir.1981). The Abshire case was cited and applied in Royer v. Cliffs Drilling Co., Inc., 465 So.2d 11 (La.App. 3d Cir.1984), writ denied, 466 So.2d 453 (La.1985), wherein damages for a second work-related incident were held to be “directly traceable” to a previous work-related auto accident, and full reimbursement was granted. Similarly, this Circuit has enunciated that test in Frix v. Supreme Catering Serv. and Aetna Ins., 444 So.2d 710 (La.App. 5th Cir.1984):
An employee’s disability will be presumed to have resulted from an employment accident if before the accident the employee was in good health, but commencing with the accident the symptoms *887 of the disabling condition appear and continuously manifest themselves, provided that the evidence shows that there is a reasonable possibility of causal connection between the accident and the' disabling condition, (quoting Field v. Winn Dixie, Inc., 427 So.2d 616 (La.App. 5th Cir.1983, emphasis supplied by the Frix court.)
Frix, supra at 713.
The record shows that the only expert to testify was Dr. Bert Bratton, the neurosurgeon who treated Edward Veal since April of 1982. Initially, he treated him for lower back pain prior to either accident and had in fact performed a surgical discectomy and fusion. Thereafter, he released Veal for work, finding only occasional residual pain. On July 15, 1983, Dr. Bratton saw the patient, who then complained of only some lower back pain. The next time Veal saw Dr. Bratton was on August 15, 1983, one day after the stretcher incident and six days after the auto accident. On this visit, he informed the doctor of the August 9 auto accident and Dr. Bratton found the plaintiff to have a cervical strain with mild cervical spasms. A muscle relaxant was prescribed. On August 24, 1983, he again saw Dr. Bratton and related the stretcher incident. At that time, Dr. Bratton found some symptoms of a ruptured disc which were not present on August 15. He recommended Veal not work for one month. It was not until September 12 that Dr. Brat-ton changed his diagnosis from a cervical strain to cervical radiculopathy and recommended cervical traction. Ultimately, on October 7, 1983, Dr. Bratton hospitalized Veal for a myelogram because the patient’s difficulties were worsening. The myelo-gram showed a defect in the cervical area, and Dr. Bratton performed an anterior cervical discectomy at the C-6-7 level. At that time, a ruptured disc was found on the patient-plaintiff’s right side. As he was the only physician to testify, Dr. Bratton’s assessment of what caused Veal’s ultimate disability is pivotal, deserving quotation:
Going on what we have, which was truly objective, the myelogram did not show a significant disc pressure. His surgery did show a large disc rupture. The type of disc rupture he was subsequently to have on the myelogram and at surgery, in my opinion, that would have occurred because of the arm pain. It was large enough to .cause pain in the arm. So that would be the right arm pain, so I would say that the ultimate findings I found were the result of injury or injuries, which caused the disc to get to that point. Certainly, his neck pain started following his motor vehicle accident. There is a good reason to think that the disc was partially damaged at that point, but not fully ruptured. The subsequent stress on it from pushing the stretcher may have caused the subsequent further rupturing of a disc. A disc does not have to rupture at one point in time, it can continue. Once it is weakened and continues to rupture — and / have seen this on many occasions so my opinion: he weakened this disc with the accident; the subsequent stress caused the complete rupture because of the degree of the rupture; if it had been there all along, it would have caused arm pain.
[Question from Court]
Percentage wise, that is going to be extremely difficult because you almost have to say that if one injury had not occurred, it would not have been enough to cause the subsequent disc rupture at the degree that it required surgery so I am almost going to have to say quite arbitrarily fifty-fifty. If one hadn’t occurred, the other one wouldn’t have lead [sic] to surgery. If the auto accident simply weakened the disc and the pushing of the stretcher was the second significant stress that caused the disc to get to the point to be a surgical disc, so I mil have to say arbitrarily each one played an equal role in getting him to the point of requiring surgery.
This testimony went unrebutted and consequently was weighed and heavily relied upon by the trial judge. Accordingly, we need only take Dr. Bratton’s above-quoted statements and apply the appropriate legal standard.
*888 After a careful review of the record, bearing in mind our jurisprudential guidelines, we find that, prior to the August 9 automobile accident, Veal was experiencing only residual lower back pain resulting from a past operation, and was working relatively unhindered. After the auto accident, he was in a great deal more pain, although he continued working. According to Dr. Bratton, the auto accident set in motion the disc weakness, which eventually resulted in rupture. The symptoms for disc injury manifested themselves in pain until the August 14 stretcher incident, a task Veal undoubtedly performed countless times during his 25 years in the service of Bonnabel Hospital. But for the auto accident, Veal probably would have pushed the stretcher from the X-ray room with hardly any pain, based on Dr. Bratton’s assessment of causation. Once the accident had occurred and the plaintiffs disc was damaged, a further rupturing of the disc apparently was inevitable and rather probable, given the plaintiffs tasks at Bonnabel. Indeed, the stretcher incident contributed “fifty-fifty” to the overall rupturing of the disc; however, Dr. Bratton explained, “if one [the auto accident] hadn’t occurred, the other one [the stretcher incident] wouldn’t have lead [sic] to surgery.” So although each incident played an equal role, in the doctor’s opinion, in making surgery required, it was the auto accident which in reality made the plaintiff unfit for his employment with Bonnabel Hospital. Accordingly, the trial court did err.
Finally, we turn to address the manner in which the court handled the question of interest to the compensation insurer. La. C.C.P. art. 1921 states: “The court shall award interest in the judgment as prayed for or as provided by law.” Additionally, legal interest shall attach from the date of judicial demand on all judgments sounding in damages “ex delicto.” La.R.S. 13:4203; Chiasson v. Whitney, 427 So.2d 470 (La.App. 5th Cir.1983), writs denied, 433 So.2d 179, 180, 183 (La.1983); Probst v. Wroten, 433 So.2d 734 (La.App. 5th Cir.1982), reh’g granted.
The petition in intervention does in fact include a prayer for “legal interest thereon from date of judicial demand.” Clearly, St. Paul is entitled to interest as commanded by law. Larson v. Huskey, 440 So.2d 769 (La.App. 4th Cir.1983); Lennix v. St. Charles Grain Elevator Co., 439 So.2d 1249 (La.App. 5th Cir.1983).
We note that the date the petition in intervention was “filed as prayed for” is March 26, 1985, seeking $16,502.68, which had been paid to the defendant. Thereafter, a lump sum settlement had apparently been reached between St. Paul and Veal totaling $63,558.45. Therefore, legal interest on the first $16,502.68 should be calculated from the March 26, 1985 judicial demand whereas interest on all other payments should be calculated only from the date of payment. See Larson v. Huskey, supra. We note finally the withdrawal of $30,000 from the registry of the court by the appellant on the date of July 9, 1986, which would discontinue legal interest on that amount on that day. Accordingly, the appellant is entitled to legal interest, in accordance with the directives presented herein, from the date of judicial demand, until paid; therefore, the trial court did err.
For the reasons assigned, the judgment of the trial court dated March 26, 1986, which decreed “that the intervenor, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, is to receive the sum of THIRTY THOUSAND ($30,000.00) DOLLARS for its intervention,” is amended to read “that the intervenor, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, is to receive the sum of SIXTY-TWO THOUSAND FIVE HUNDRED FIFTY-EIGHT DOLLARS AND FORTY-FIVE CENTS ($62,558.45) for its intervention.” Moreover, the judgment is also amended to include the awarding of legal interest as prescribed. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellee.
AMENDED AND AFFIRMED.
WICKER, J., dissents in part.

. On p. 4 of the appellant's brief, St. Paul argues it is "automatically and/or summarily entitled to recover the amount of compensation benefits and medical expenses paid to employee pursuant to R.S. 23:1102(C).” While the statutes state that a compromise to which the employer, or his insurer, does not consent does not affect the reimbursement rights of the employer, it makes no mention of any summary procedure or automatic device for such reimbursement. Accordingly, the trial court committed no error in ordering the intervenor to prove the claim relative to its intervention.