588 So.2d 1130 (1991)
Joseph E. HURST
v.
Charles R. EATON, Estes Cadillac, Inc. State Farm Insurance.
No. CA 89 2044.
Court of Appeal of Louisiana, First Circuit.
October 18, 1991.
*1132 Paul Katz, Covington, for plaintiff-appellant.
Raymond A. Pelletri, New Orleans, for defendants-appellees.
Before EDWARDS, LANIER and GONZALES, JJ.
EDWARDS, Judge.
Plaintiff, Joseph E. Hurst, appeals the judgment pursuant to a jury verdict which awarded him $20,000.00 in damages for injuries resulting from an automobile accident, less a credit for amounts previously received in medical payments, plus interest and costs. He contends that the jury awarded inadequate special and general damages for his injuries and that his award should not have been subject to a credit for the medical payments which he received from the insurer of the vehicle in which he was riding at the time of the accident. For the reasons hereinafter stated, we amend and affirm the judgment.

FACTS AND MEDICAL TESTIMONY
Liability was not at issue in this trial, as the parties stipulated the events of the accident in question. The only issue before the jury was the existence and extent of damages arising from the accident, and the only defendant was State Farm Mutual Automobile Insurance Company (State Farm), who was the insurer for both vehicles involved in the accident. Mr. Hurst was a guest passenger in an automobile driven by Tammy Parker on May 30, 1985, when the collision occurred. A vehicle driven by Charles R. Eaton executed a left turn from the right lane directly into the path of Ms. Parker's car. The two vehicles had been travelling north on a divided fourlane highway. After the accident, the plaintiff did not seek immediate medical attention, despite having struck the windshield with his head with sufficient force to crack the glass. He also testified that he had struck his shoulder on the "post." Mr. Hurst went home and sought emergency room treatment on the following day. He was referred to his treating physician for further treatment, whom he saw eleven days later.
From this point, plaintiff's course of medical treatment and the testimony thereon by the various experts who treated him become somewhat complex and detailed, the reasons for which are compounded by his medical history prior to the accident. At the time of the accident, Mr. Hurst had been a diabetic for over 17 years and had various problems associated with that condition. Additionally, because of prior accidents and a congenital condition, he had two separate cervical disc fusions. The defendant successfully contended at trial that the problems which plaintiff suffered subsequent to the accident were not caused by the accident itself, but were at least partially, if not completely, the result of plaintiff's pre-existing medical problems. A review of the medical testimony, in the order presented at trial, rather than a chronological overview, is helpful to understanding the jury's verdict.
Dr. Bruce S. Samuels, who was qualified by the court as an expert in internal medicine, testified first. He was consulted by Mr. Hurst's treating physician to manage plaintiff's medical problems, rather than his injuries, while he was hospitalized in November, 1985, nearly six months postaccident. Dr. Samuels stated that he found objective signs of muscle spasm in the patient's neck and lower back, that his blood pressure was not well controlled, and that there were eye ground changes consistent with elevated blood pressure. Mr. Hurst was at that time already taking Minipress, an anti-hypertensive medication. Dr. Samuels testified that the effect of physical trauma, pain, and emotional distress on hypertension usually is to elevate it, as well as to adversely affect the control of diabetes. He felt that the most probable explanation of plaintiff's diabetic and hypertension problems during this period was that they resulted from the automobile accident and trauma.
Dr. Samuels also explained some of the adverse effects of diabetes on the body. *1133 He stated that it affects how the white blood cells work, and consequently how one heals. It can damage nerves, the eyes and the kidneys. While he admitted that some of the mechanisms, particularly of eye damage, are not well understood, he also opined that "the stress of this patient's injury adversely affected his diabetic control which would definitely contribute to either the occurrence or the acceleration of diabetic retinopathy...." He defined diabetic retinopathy in layman's terms as a loss of vision or blurring, and explained that he did not treat this condition in patients, and therefore, did not question plaintiff extensively in this regard. On cross-examination, he admitted that he did not have any information or records of plaintiff's previous blood pressure and blood sugar levels prior to the accident, and therefore, could not say whether Mr. Hurst's elevated blood pressure was something new or something old.
Additionally, Dr Samuels diagnosed gastritis in Mr. Hurst, based on his vomiting blood shortly after his discharge from this first hospitalization November 24December 5, 1985, which had resulted in his readmission on the day after his discharge, December 6, 1985. Dr. Samuels defined gastritis as a diffused irritation of the lining of the stomach that usually precedes ulcers and which sometimes bleeds; he opined that the gastritis was also attributable to the accident because physical pain, trauma, and emotional stress, which plaintiff claimed to be suffering as a result of the accident, are known causes of this condition. He also stated that gastritis would adversely affect diabetes, because the patient would be unable to eat if nauseated, and consequently, his blood sugar levels would be affected. Finally, he testified that Mr. Hurst also had a fungus infection in his esophagus, which can occur from uncontrolled or poorly controlled diabetes. He and his partner, a Dr. Huddleston, disagreed on whether the GI bleeding was caused by the gastritis or the esophageal infection. Dr. Samuels' conclusion was that both hospitalizations in November and December of 1985 were, if not directly, at least indirectly attributable to the accident.
Dr. David Jarrott, who was plaintiff's treating neurosurgeon, testified next and was accepted as an expert in the field of neurosurgery. He stated that he had first seen Mr. Hurst after a prior accident in September, 1979, and had performed a cervical disc fusion at the C6-C7 level in 1980 as a result of that earlier injury. The plaintiff had a satisfactory recovery from the 1980 fusion. Mr. Hurst also has a congenital fusion, one present from birth, at the C5-6 level. Dr. Jarrott saw the plaintiff eleven days after this accident, and his initial impression at that time was cervical sprain. There were no X-rays taken at that visit. He did not think surgery was appropriate, but because of Mr. Hurst's continued complaints of neck, shoulder, right arm and head pain, he admitted plaintiff to the hospital in November, 1985, to run tests. He related the patient's continued symptoms to a disc abnormality at the C7-T1 level, immediately below the 1980 fusion at C6-C7, based on an EMG in November, 1988, which documented "evidence of nerve damage of the type that would be related to pressure on the nerve in the cervical spine or in the neck." Dr. Jarrott thought this was related to the development of a calcium deposit or spur on the edge of the disc in question, which was pressing upon nerves. He noted that Mr. Hurst did not have this problem prior to the May, 1985 accident.
Dr. Jarrott testified that by June, 1986, he had thought that plaintiff was back to his pre-1985 accident state. However, because of Mr. Hurst's continued complaints, he did more tests and consequently changed his opinion. He felt that plaintiff's continued problems related back to the May, 1985 accident. A CT scan in mid-1988 showed "evidence suspicious of a rupture of the disc at C4-C5," immediately above the disc that would bear the greatest strain in movement since the earlier 1980 fusion at C6-C7. However, later tests indicated no evidence of herniation at C4-C5, only of a bulge. At the time of trial, there was no indication of herniation at C7-T1, but there was a spur or calcium deposit on the disc; EMG findings of nerve damage in *1134 plaintiff's right arm in November, 1988, indicated that further disc surgery would be necessary at this level.
Dr. Jarrott had initially assigned a 50-50 distribution of responsibility for plaintiff's condition to his previous fusion and to reinjury in the 1985 accident. However, at the time of trial he felt that the automobile accident was mostly to blame. He stated that the necessity for surgery on Mr. Hurst at the C7-T1 level was largely caused by the accident. On cross-examination, however, he admitted that "... the C7-T1 abnormality could be the result of the cumulative wear and tear as a result of the C5-6 congenital fusion and the C6-7 surgical fusion in 1980 or thereabouts."
With regard to plaintiff's blood pressure, Dr. Jarrott testified that his records indicated a reading as high as 150 over 100 on one occasion, prompting a tentative diagnosis of hypertension, but that readings on other occasions were normal, or on one occasion, borderline. He felt that a single such high reading did not make the diagnosis (of hypertension).
Finally, Dr. Jarrott testified that plaintiff's whole body disability, based on prior neck injury, was twenty percent. If Mr. Hurst underwent another disc surgery, as the test findings warranted, he would be assigned an additional ten percent whole body disability. Plaintiff also was assigned a twenty percent whole body disability rating for previous injuries to his arms, unrelated to this accident.
The next expert to testify was Dr. George Ellis, Jr., an ophthalmologist with a subspecialty in eye muscles, eye pathology and related disorders. At the time he began treating Mr. Hurst, Dr. Ellis was an assistant professor of ophthalmology at the LSU Eye Center, to whom plaintiff had been referred by other doctors within that facility. He explained that the plaintiff suffered from several different eye problems; the specific one for which the referral was made was a left sixth nerve palsy or left lateral rectus palsy. In simple terms, this condition caused horizontal double vision (diplopia), or palsy of the lateral rectus muscle on the left side; the muscle was nonfunctioning because the nerve to that muscle was nonfunctioning. Plaintiff's other eye problems were diabetic retinopathy, or blurred vision, and vertical diplopia, or double vision, which was due to a previous problem in 1982, and not related to either his diabetes or this accident.
Dr. Ellis was convinced that Mr. Hurst's horizontal double vision was caused by trauma, and specifically, the 1985 accident. He testified that the four other possible causes of this problem had been ruled out by testing; they were thyroid disease, myasthenia gravis, tumors and/or hemorrhage, and diabetes. The first three were eliminated by means of objective tests, such as CT scans and a Tensilon test (for the myasthenia gravis). Dr. Ellis stated that the time factor involved had ruled out diabetes, as there would have been improvement within six months if diabetes had been the cause. In this patient's case, there had been no change for almost a year.
Plaintiff's double vision problem was treated with surgery by Dr. Ellis. He explained that normally we have 100 degrees of single vision, but that because of Mr. Hurst's left sixth nerve palsy and the corresponding palsy of the left lateral rectus muscle, this patient had only 40 degrees of single vision, which was displaced to his right side. Thus, Mr. Hurst would have to turn his head in order to see properly. By surgically moving one of his eye muscles, Dr. Ellis was able to increase plaintiff's field of vision to 60 degrees and shift it straight ahead. However, this field of vision had since contracted down to 20 or 30 degrees. Dr. Ellis stated that scarring from the surgery would normally occur, and could be expected to cause contracture of the field of vision from 60 degrees to about 40 degrees. However, he felt that the further contracture down to 20 or 30 degrees was most likely due to the diabetes. He did expect that there would be an improvement back up to about 30 or 40 degrees if the diabetes were indeed responsible for the secondary contracture; if not, Mr. Hurst would be a candidate for a second surgery.
*1135 Dr. Ellis assigned a 25 percent whole body impairment to plaintiff for the diplopia resulting from this accident. He also stated that he disagreed with Dr. Samuels' opinion that the diabetic retinopathy was affected by how well controlled Mr. Hurst's diabetes was, as he felt there was no correlation between them.
The next expert to testify was Dr. Richard Warren Levy, a neurosurgeon who testified on behalf of the defendant. He stated that he had seen Mr. Hurst on August 19, 1988, more than three years post accident. He noted tenderness on the back of plaintiff's neck, and found every one of his neck maneuvers were slightly restricted from what Dr. Levy thought should be the normal range of motion. Although he found no evidence of a herniated disc on that date, he did state that numbness was present in Mr. Hurst's legs, which he attributed to the distribution of the fifth lumbar nerve root.
Dr. Levy testified that the 1985 myelogram taken at Montelepre Hospital indicated an "absence of filling of the nerve root sheath" between C7-T1, which was compatible with a herniated disc or bony spur compressing the nerve root sheath. However, the November, 1988 myelogram from Methodist Hospital showed the C7-T1 nerve root sheath to be filled out well. The CT scan performed immediately after this myelogram showed a "mild broad bony spur projecting directly backwards and a little bit to the right." Dr. Levy felt that this bony spur did not distort the spinal cord backwards or the nerve root out to the right, and there was no evidence of a herniated disc. His opinion was that no further neurosurgical operation was indicated. His conclusion was that plaintiff might be having symptomatology as a result of his 1980 disc fusion, because "[a]nytime a person has a fusion of two or more vertebrae in the neck, the stress from motion over the ensuing years produces a change in the discs immediately below and immediately above, more stress than if the person had no fusion at all." Dr. Levy also stated that he found no evidence of diabetic neuropathy.
On cross-examination, Dr. Levy admitted that, given this patient's history, with the occurrence of an automobile accident in which Mr. Hurst's head struck the windshield with sufficient force to break the glass, one would expect a lot of pressure on the discs above and below the 1980 fusion"[c]ertainly on the neck in general and possibly those discs." He also admitted that his own physical examination of plaintiff took only ten to twelve minutes, and that another physician who had seen this patient before and after the injury in question would be in a better position to say what the patient had before the injury and what he had after the injury.
The last expert to testify was Dr. Andrew Benson, an ophthalmologist. He first saw the plaintiff on May 13, 1986, nearly one year after the accident. Mr. Hurst gave a history of eye problems, specifically, double vision, over the previous three or four months, and diabetic retinopathy for at least the same amount of time. He also told Dr. Benson that he had seen another doctor, who had made an effort to correct his problem with prisms, but Dr. Benson did not pursue any details of this prior examination or findings.
Dr. Benson stated that usually diplopia induced by trauma begins within a few days or a week after the trauma. He referred Mr. Hurst to the LSU Medical Center for treatment, and had no further contact with plaintiff. Although he testified that diabetes cannot always be ruled out as a cause for diplopia, he admitted that he was not in a position to challenge Dr. Ellis' opinion ruling out diabetes as the cause of Mr. Hurst's double vision.
Plaintiff testified that after the accident when his vision problems began, he did not realize what was wrong. At first he thought he merely needed to have his eyeglass prescription changed, so he finally went to a Dr. Schoenberger in January, 1986, who did change his prescription. When his problems continued, Mr. Hurst then went to see Dr. Benson. On cross-examination, he further explained that he could not state exactly when the double vision developed after the accident because *1136 at the time, he was not sure what the problem was, and that it was not constant, but would come and go until it got progressively worse.
Neither the plaintiff nor the defendant presented the testimony of Dr. Schoenberger.
The jury returned a verdict in response to special interrogatories as follows:
1. Was Joseph E. Hurst injured or was his previous condition aggravated by the accident on May 30, 1985?
YES &check; NO___
If you answered no, stop. Have the jury foreman sign and date this verdict sheet and return to the courtroom.
If you answered yes, go to question number 2.
2. What amounts do you award Joseph E. Hurst for:

Physical Pain and Suffering..... $7,000.00
Mental Anguish ................. 7,000.00
Past Medical Expenses........... 6,000.00
Future Medical Expenses......... -0-
Permanent Disibility [sic] ..... -0-

Thus the jury awarded to plaintiff $14,000.00 in general damages and $6,000.00 in special damages.

DAMAGES
Plaintiff's contention on appeal is that the amount of his award was inadequate because the jury misunderstood the medical testimony.
This court summarized the standard to be applied in an appellate review of quantum in Lee v. USAA Casualty Insurance Company, 540 So.2d 1083 (La.App. 1st Cir.), writ denied, 542 So.2d 514, reconsideration denied, 544 So.2d 384, 385 (La. 1989), reversed in part on other grounds, 571 So.2d 127 (La.1990) as follows:
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record.... Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded.... In the final analysis, the damages due in a given case must reflect the facts and circumstances of that case.... [Citations deleted.]
540 So.2d at 1091.
After a careful consideration of the record, we find that the jury abused its much discretion in its award of damages. Although the interrogatories answered by the jury were not as detailed as the complex medical testimony in this case warranted, we have been able to surmise some of the findings reached but not specified by the verdict form and will address each in turn.
By not awarding any future medical expenses, the jury inferentially found the testimony of defendant's expert neurosurgeon, Dr. Levy, to be more credible than that of Dr. Jarrott, plaintiff's treating neurosurgeon, regarding plaintiff's need for another disc surgery. Moreover, Dr. Jarrott did admit that plaintiff's continued complaints after 1986 could be the result of wear and tear on the C7-T1 disc due to the previous surgical and congenital fusions, although such was not his own opinion. While this court might have reached a different conclusion in evaluating this testimony, we cannot say that the jury was manifestly erroneous in this regard or that Dr. Levy's conclusion regarding this surgery was patently unsound. See, Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990).
Likewise, we find no error in any failure to award future medical expenses for the possible second surgery on Mr. Hurst's left eye which Dr. Ellis testified he might need. Dr. Ellis' testimony was that the secondary contracture in plaintiff's field of vision from about 40 degrees down to 20 or 30 degrees was probably due to his *1137 diabetes. This was a medical conclusion. It was not a statement on legal liability. As this court has previously noted, a tortfeasor takes his victim as he finds him and aggravation of a pre-existing condition is compensable. Harper v. Boudreaux, 496 So.2d 439 (La.App. 1st Cir.1986). Likewise, the complication or effect of a pre-existing condition upon the injury caused by the tortfeasor is compensable. Mr. Hurst would therefore be entitled to the expenses of this second surgery, even though necessitated by the effect of his diabetes on the first surgery's results. However, Dr. Ellis testified that he had every hope that this second surgery would be unnecessary, and expected an improvement in plaintiff's field of vision. Therefore, the jury was not clearly wrong in concluding that an award in this regard was not warranted.
However, the record is clear that the jury's remaining findings were manifestly erroneous and the awards inadequate and an abuse of discretion. The testimony and evidence on plaintiff's initial complaints of head, neck, and shoulder pain immediately after the accident, which Dr. Jarrott diagnosed as cervical sprain resulting from the impact of plaintiff's head with the windshield, were clear and unrebutted. Mr. Hurst was not symptomatic after his 1980 fusion recovery until this accident occurred. Dr. Jarrott testified that he initially thought the plaintiff had returned to his pre-accident condition as of June, 1986. Therefore, Mr. Hurst is entitled to his medical expenses regarding his cervical complaints for the period of time from the accident until June, 1986.
Plaintiff is also entitled to his medical expenses in connection with his treatment by Dr. Samuels both in and out of the hospital following the accident. Dr. Samuels' testimony was uncontradicted that the problems which Mr. Hurst experienced with the control of his diabetes, blood pressure and gastritis were attributable to the accident on May 30, 1985. To the extent that the award for past medical expenses may have excluded these expenses, the jury abused its discretion in ignoring the unrefuted testimony by the plaintiff's treating physician regarding these problems.
Dr. Ellis' testimony that Mr. Hurst's horizontal diplopia and its resulting surgery were caused by the trauma from the accident, was conclusive. The defendant's attempt to rebut this testimony with Dr. Benson's testimony was unsuccessful, in view of Dr. Benson's own referral of the plaintiff to the LSU Eye Center, where Dr. Ellis saw plaintiff, for treatment, and of Dr. Benson's admission that he was not in a position to challenge Dr. Ellis' opinion. Therefore, Mr. Hurst is also entitled to the expenses resulting from the treatment for this problem.
Our calculations for these medical expenses are as follows:

De La Ronde Hospital (6-1-85) $64.29
Dr. Mui (6-7-85) 32.00
Dr. Jarrott (6-10-85
 through 6-10-86) 1,510.00
Montelepre Hospital (11-24-85
 through 2-3-86) 8,445.00
Dr. Samuels and Huddleston
 (11-24-85 through
 2-3-86) 1,185.00
Dr. Martin Schoenberger
 (1-24-86 through 2-14-86) 60.00
Dr. Andrew Benson (5-13-86
 through 5-21-86) 86.00
LSU Eye Center (7-9-86
 through 9-23-88) 1,331.50
[These charges excluded
 treatment for plaintiff's
 diabetic retinopathy and
 vertical diplopia from
 1982].
Hotel Dieu Hospital (10-6-86) 392.14
 TOTAL ................. $13,105.93

Therefore, we amend the jury's award for past medical expenses to increase it to $13,105.93.
In connection with plaintiff's horizontal diplopia resulting from this accident, Dr. Ellis assigned him a 25 percent whole *1138 body disability rating based on Mr. Hurst's regaining 30 to 40 degrees of single vision. This testimony was uncontradicted. It was either manifest error or legal error[1] for the jury to fail to award damages to Mr. Hurst for his disability. After reviewing other cases involving comparable injuries, we find that the lowest award within the discretion of the jury for this permanent disability is $45,000.00. See, Buquoi v. Allstate Insurance Company, 556 So.2d 163 (La.App. 5th Cir.1990) [involving vertical diplopia] and the cases cited therein. The jury's assessment of Mr. Hurst's damages for this item is amended to include this amount.
With regard to the award for physical pain and suffering in the amount of $7,000.00, the testimony by Mr. Hurst and his physicians of his various problems, which were unresolved for approximately a year after the accident, and the testing and treatment therefor convinces us that this amount was inadequate and should be increased to $40,000.00. See, for example, Thomas v. Hartford Insurance Company, 540 So.2d 1068 (La.App. 1st Cir.), writ denied, 542 So.2d 516 (La.1989). We amend the jury's assessment of this item of damages to this amount.
After a careful consideration of Mr. Hurst's testimony, we are unable to say that the jury's award of $7,000.00 for mental anguish was an abuse of discretion. Therefore, we decline to amend it.
For the foregoing reasons, the judgment of the district court is amended to increase the award in favor of plaintiff and against the defendant, State Farm Mutual Automobile Insurance Company, to $105,105.93, less the amounts previously paid to plaintiff by defendant of $647.88 and $6,001.39[2], for a net judgment of $98,456.66. Costs for this appeal are assessed to the defendant.
AMENDED, AND AS AMENDED, AFFIRMED[3].
NOTES
[1] We are unable to determine from the verdict form whether the injury which the jury found Mr. Hurst to have suffered was the cervical sprain testified to by Dr. Jarrott, the horizontal diplopia testified to by Dr. Ellis, or the aggravation of his diabetes and blood pressure and gastritis testified to by Dr. Samuels, or even a combination of one or more of these problems. If it was the diplopia, with its resulting permanent disability assignment, then the jury committed legal error in not awarding plaintiff damages for same. If the jury did not find Mr. Hurst to have suffered horizontal diplopia as a result of this accident, with its ensuing disability, then it was manifestly erroneous.
[2] We find no merit to plaintiff's second assignment of error regarding State Farm's credit for medical payments previously made, as the parties stipulated to this credit at trial. See, R.J. D'Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984), regarding the effect of a stipulation on a case. We therefore decline to address this issue.
[3] Although one of our panel members would agree to amend and affirm the judgment, but disagrees with the amount of the proposed amendment, we find it unnecessary to resubmit this matter to a five-judge panel under La. Const. art. V, § 8(B). Our research discloses no prior published cases in this circuit in which a three-member panel was divided on the question of amending a judgment. However, our brethren in the other circuit courts of appeal have considered the issue in similar situations, and their discussions have been helpful. We find, after considering the opposing positions of the Second Circuit (see, for example, Sanders v. State Farm Mutual Automobile Insurance Co., 516 So.2d 1162 (La.App. 2nd Cir.1987) and the other circuits, that we agree with the interpretation of La. Const. art. V, § 8(B), LSA-C.C.P. art. 2082, and Rule 1-5, Uniform Rules, Courts of Appeal, expressed by our brethren in the Fifth Circuit in Veal v. Dwyer, 504 So.2d 884 (La.App. 5th Cir.1987) on application for rehearing.

See also State, Department of Highways v. Mims, 336 So.2d 24 (La.App. 3d Cir.) on application for rehearing, writ denied, 339 So.2d 16 (La.1976), and Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.) on application for rehearing, writ not considered, 437 So.2d 1135 (La.1983).